UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | No. 19 CR 518-1 |
| vs. | Hon. Ronald A. Guzman |
| DESHAWN DANZLER | |

DESHAWN DANZLER'S SENTENCING STATEMENT

DESHAWN DANZLER, by his attorney, Keri A. Ambrosio, respectfully submits the following sentencing request in light of the probation officer's recommendation and the factors articulated under 18 U.S.C. § 3553(a) and the purposes of sentencing set forth in paragraph (2).

I.   Sentencing Request

The Court will sentence Mr. Danzler on February 18, 2021 for his conviction by plea declaration of the charge outlined in the indictment: criminal contempt of court. Mr. Danzler respectfully requests the Court impose the recommended sentence of time-served. The nature of the offense conduct, Mr. Danzler's acceptance of responsibility, the capability of this community to monitor Mr. Danzler through supervised release, and the extraordinary impact of COVID-19 on the incarcerated, collectively support the recommended sentence.

1

II.     Guidelines

Mr. Danzler agrees the probation officer correctly concluded the base offense level is 6 pursuant to USSG §2A1.1 and 2X3.1(a)(3)(A)). (PSR ¶65.) Mr. Danzler objects to the 3-point enhancement under USSG §2J1.5(b)(1). (PSR ¶66.) There is no factual basis substantiating application of the enhancement, and Mr. Danzler is without sufficient information to conclude whether the 3-point enhancement of the offense level is correct. The enhancement is not regularly applied in the context of criminal contempt or otherwise, and supporting case law is not readily apparent. Application Note 1 to the guideline indicates, "[s]ubstantial interference with the administration of justice" includes a termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources. In this case, there are no facts before the Court which prove the murder investigation ended due to Mr. Danzler's conduct. *See United States v. Moy*, 1995 U.S. Dist. LEXIS 6732, *18 (N. District Il, Judge Nordberg) (evidence does not substantiate obstruction as a premature or improper termination of a felony investigation previously commenced.)

The officer next reduced the offense level by 2 points for acceptance of responsibility pursuant to USSG § 3E1.1(a), a reduction which is not in dispute. (PSR ¶72.) The defense-calculated Guideline imprisonment range, based on an adjusted offense level of 4, and criminal history categorization of V, is 4-10 months' incarceration.  (*See* PSR ¶¶76-86 for criminal history.) Mr. Danzler agrees with the

2

probation officer's recommendation that no supervised release is necessary. (PSR recommendation at p. 1.) Undersigned counsel defers to the Court regarding supervision, but if the Court elects to impose a term with conditions, counsel recommends conditions requiring Mr. Danzler to earn his GED and participate in employment training.

III. Sentencing Factors

A custodial sentence withing the 4-10 month range, time considered served, would satisfy the four purposes of sentencing --- retribution, deterrence, incapacitation, and rehabilitation. This sentence would reflect the seriousness of the offense and careful consideration of Mr. Danzler's history, his acceptance of responsibility, the current conditions in the Bureau of Prisons related to the pandemic, and the cost of incarceration. The defendant asks the Court consider all of these factors before determining the appropriate sentence.

  A. History and characteristics of the defendant

"You know how it is out here…kids get killed out here."[1] Mr. Danzler's words at the age of 20 to law enforcement aptly described the circumstances then, and those increasingly now, surrounding our fellow community members in many Chicago neighborhoods.[2] Mr. Danzler spoke those words five months after someone shot him in

---

[1] *See* PSR ¶81.
[2] *See* Chicago Sun Times, December 30, 2020, https://chicago.suntimes.com/2020/12/30/22206618/chicago-gun-violence-homicides-policing-community-outreach-university-of-chicago-crime-lab-editorial (Chicago 2020 homicide rate highest seen since 2016.)

the face as he stood within the doorway of his home. Mr. Danzler is operating in life, like too many others, under the assumption that someone he loves, will fall prey to gun violence. The pace is already set when one is born within a community rife with daily violence. The path undertaken by Mr. Danzler is more expected than not. Mr. Danzler's story is case in point: Chicago's children, predominantly impoverished African American children, are born into poor, crime-ridden neighborhoods in which there is little opportunity beyond criminal enterprises, diminished educational opportunities, and little to no hope. The streets and schools aren't safe, the prospects are limited, and there is a whole long list of things for children and adults to worry about. Mr. Danzler was no stranger to personal violence even before he was shot. One of his brothers, only 11 years old, was shot and killed. (PSR ¶103.) Mr. Danzler has lost cousins and friends to violence. (PSR ¶113.) His own horrific experience as a victim is well-described within the PSR, and the event, contra to the government's version, is mitigating rather than aggravating. (PSR ¶¶48, 114.) The shooter shot Mr. Danzler three times from the stairwell of Mr. Danzler's apartment building, while Mr. Danzler stood within the doorway <u>of his home</u>. ( PSR ¶114.) It remains unknown why anyone shot Mr. Danzler. Mr. Danzler is the victim, yet he stands convicted of criminal contempt and will have served almost two years in prison by the time he stands before the Court for sentencing. Surgeons spent hours closing the wounds in Mr. Danzler's head, and in the weeks following the initial surgery, surgeons inserted rods and screws into his broken wrist. *Id.* Mr. Danzler reports experiencing frequent pain as a result of the shooting, as well as

frequent, unsettling thoughts. (¶¶114, 120-126.) That Mr. Danzler has been incarcerated for almost two years for a nonviolent crime, derived from circumstances of which he was a victim, results in overstatement of the seriousness of the offense.

Still, the Court is required to consider that Mr. Danzler's criminal history began at 15 and is marked by convictions for mob action, reckless conduct, cannabis possession, and progressively more serious charges such as distribution, UUWs and felon in possessions. (PSR ¶¶81-100.) At 26 years old, the state has already sentenced Mr. Danzler to nine years' custody. Further, after Mr. Danzler is released from federal custody, he will return to the Illinois Department of Corrections to finish a sentence for manufacture and delivery and felon in possession of a firearm. (PSR ¶83.) But, Mr. Danzler's criminal conduct is not what is most concerning here; instead, it is the complete absence of care given him by the state and federal government after years of conduct and characteristics indicated he needed intervention. Indeed, by the time Mr. Danzler is released from the (at least) 701 days in federal custody,[3] he will have received no help for issues relating to loss, anger, post-traumatic stress disorder, and other issues, all detailed in paragraphs 14-41 and 120-132 of the PSR. To date, Mr. Danzler has been admonished rather than treated. He is finally in position to receive much needed help rather than ineffective further imprisonment. This Court has an opportunity to impose a sentence which reflects the seriousness of the offense and needed training and treatment.

---

[3] Mr. Danzler was writted to federal custody March 20, 2019, and will remain as such until at least his sentencing date, February 18, 2021.

5

B. Impact of Incarceration

Mr. Danzler has already spent more time incarcerated than is recommended under the unduly punitive Guideline range for what is a nonviolent offense. In determining the sentence, counsel also asks the Court consider that Mr. Danzler's service of prison time will accompany him for the rest of his life. Exposure to the criminal justice system carries consequences that will extend far beyond Mr. Danzler's release from any prison. A September 15, 2020 Brennan Center for Justice report demonstrates that the effects of conviction and imprisonment persist for decades, entrenching inequality and perpetuating poverty. *See* brennancenter.org: *Conviction, Imprisonment, and Lost Earnings: How Involvement with the Criminal Justice System Deepens Inequality.* Even worse is that formally imprisoned African Americans suffer greater earning losses than their white counterparts, thus exacerbating the already vast racial wealth gap that has changed little over the past 50 years. *Id., citing to* Aliprantis and Carroll, *What Is Behind the Persistence of the Racial Wealth Gap?*; Darity et al., *What We Get Wrong About Closing the Racial Wealth Gap*. The Brennan Center authors recommend reductions of penalties, reclassifying felonies as misdemeanors, decriminalizing some offenses, and expanding programs that would assist in employment, as means to lessening the poverty-stricken class of the formerly imprisoned. This Court is in a unique position to offer Mr. Danzler the help he's needed for years. The Court, in accord with the purposes of sentencing, has the power to offer guidance, treatment, and

training in any way it sees fit. The Court's sentence, then, could change the trajectory of Mr. Danzler's life.

C. Community of Support

Importantly, despite his criminal history and incarcerations, Mr. Danzler has a community of support. His mother writes that her son was a sweet boy with manners who changed after he was shot. *See* Exhibit A, p. 1. Mr. King writes that Mr. Danzler is respectful and a big help around the house. *Id.* at p. 2. Cousin Laila misses Mr. Danzler and writes about his thoughtfulness and care. *Id.* at 3. Cousin Jacques also misses Mr. Danzler and writes that he wishes Mr. Danzler was home to play in the park, play games, and go to movies. *Id.* at 4. Cousin Ms. Allen writes that Mr. Danzler helped raise her son, and that he's a "genuine person" who deserves a second chance. *Id.* at 5.

Indisputably, Mr. Danzler's history underscores the need for a thoughtful sentence. Release from prison and implementation of thoughtful release conditions will lead Mr. Danzler to the right path of conduct. The support of this court community and the support of his personal community can help Mr. Danzler succeed.

D. Impact of Covid-19 on Prisons

The Court should also factor into the sentencing determination Mr. Danzler's service of time during a pandemic, the risk inherent in that service, and the relationship

of the time served to just punishment. Mr. Danzler has already endured a prison sentence that could not have been contemplated at the time of the offense. All courts and all counsel should carefully consider the impact of Covid-19 on prison systems. Any time served during the pandemic can result in an overstatement of the seriousness of the offense such as is the case here. That a prison system might follow recommended CDC practice must not override thoughtfulness regarding the rate of contagion among prison populations and the associated illness and death resulting from the pandemic. Not one member of the court family or the justice community at large should lose sight of the reality: in under ten months, 1 in 5 prisoners within the United States has had Covid[4], at least 355,780 prisoners have been infected with the coronavirus, more than 2,228 have died from the virus, and the spread of the virus in prisons shows no sign of slowing.[5] The BOP reports that a total of 43,735 inmates have tested positive for the virus, and that presently 3,561 federal inmates and 1,991 staff members have confirmed positive tests nationwide.[6] Two hundred two federal detainees and three staff members have died from the coronavirus. *Id.* This chilling data provides strong support for imposition of a variant sentence in the case of a nonviolent offender who has a limited criminal history. Because prisons simply cannot segregate positive inmates from prison population, Mr. Danzler has been at greater risk of catching the virus than community

---

[4] *See* https://www.themarshallproject.org/2020/12/18/1-in-5-prisoners-in-the-u-s-has-had-covid-19

[5] *See* https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (Last checked January 22, 2021)

[6] https://www.bop.gov/coronavirus/ (Last checked January 22, 2021.)

8

members. The horror of COVID-19 within the prison systems is overwhelming prison systems, inmates, and staff. There is no 24-7 medical staff within the facilities. Inmates and staff routinely become ill because it is simply not feasible to contain the virus within a prison environment.[7] The Chicago Federal Defender routinely notifies counsel regarding outbreaks within the county facilities as the information is not publicized on a website. Presumably, the rate of contagion and infection that is clear via the BOP site, is happening and will continue to happen at all jails nationally. The numbers routinely go up day after day, but the numbers are only as accurate as the testing is regular and the results publicized. It is right to assume the number of positive cases is higher than reported. Undersigned counsel understands from clients across the country that separation and isolation is not happening between positive and negative inmates, due to spatial limitations and the high number of infected inmates. Mr. Danzler will have served almost a year during these extraordinary and terrifying times by the time of sentencing. He asks the Court consider that any period of incarceration during the pandemic results in an overstatement of the seriousness of the offense, particularly in the case of a nonviolent offender who expressed acceptance and remorse. Mr. Danzler has already endured a greater punishment than anyone could have contemplated: he cannot see his family members, his contact with counsel is limited to periodic telephone communications, his movements are limited within the facility including his access to

---

[7] *See* https://news.stanford.edu/2020/09/24/covid-19-spread-american-prisons/ (Coronavirus spreads quickly in American jails due to limited opportunities for social distancing and low sanitary conditions.)

9

showering and laundry services, and lockdowns are the norm. Due to close quarters and the impossibility of fully isolating residents from one another, Mr. Danzler, staff, and fellow inmates are at greater risk than the general population of contracting the rapidly spreading virus. This factor weighs strongly in favor of imposition of a time considered-served sentence.

  E. Cost of Incarceration

Mr. Danzler respectfully asks the Court consider the cost of incarceration when determining a reasonable sentence. *See United States v. DuPriest*, 794 F.3d 881, 884 (7th Cir. 2015) (noting that district judge's commentary on prison costs was proper in the context of discussing § 3553(a) sentencing factors). The most recent estimate for the cost of incarceration is $3,280 per month. (PSR at ¶164.) Assuming this is a reliable assessment of costs dating back to the start of Mr. Danzler's federal incarceration, the approximate total cost to the community at sentencing will be $75,440. Mr. Danzler has already served a longer sentence than recommended by the Guidelines. This Court has an immediate opportunity at sentencing to save resources by imposing a sentence of time-served, but one that takes into account services needed.

IV. Conclusion

  For all the reasons stated herein, counsel respectfully requests that the Court impose a sentence within the defense-calculated Guideline range, time considered served. This sentence would properly reflect the seriousness of the offense, promote respect for the law, and provide just punishment under § 3553(a), given the factors presented herein.

Respectfully submitted:

By: <u>/s/*Keri Ann Ambrosio*</u>
Keri Ann Ambrosio
53 W. Jackson Blvd., Ste. 920
Chicago, Illinois 60604
(312) 961-3261
Attorney for Mr. Danzler

# EXHIBIT A
# LETTERS IN SUPPORT

# Deshawn

Mon 2/1/2021 10:41 AM
**From:** Reshena Rollins
**To:** keri@ambrosiolegal.com



To whom it may concern.My name is Reshena Rollins. I am deshawn danzler mom, my son is not a saint by a long shot, but he is a good person. He has his faults like everyone else. When he was a little boy he was the most sweetest child you could ever meet.he had a smile that would light up anyone's day. Everyone love to watch him because he was a good kid with manners and respect for everyone. No one never had anything bad. To say about him.He has been threw alot we both have. I had alot of personal issues that i was dealing with going on in my life which had some things that affected him as well. But that doesn't excuse anything. My son change when he got shot. That moment changed us both. Him nor myself have ever got help for it. It is hard till this day to even think about that day. I need my son home i been having alot of health issues and my son was a big help to me when i be sick.I just want him to have a chance to try to live a normal somewhat life. Thank you so much for giving me this opportunity to express how i feel.

Ex. A. 001

## Received by counsel on February 1, 2021:

To whom it may concern.

My name is Rodney King. Deshawn Danzler mother's fiance. Deshawn is a young man that had a few bad breaks in life but he is a good person respectful and intelligent that helps his mom alot around the house with anything needed. I own a handyman business. He is great with his hands. Anything from painting, flooring, carpet cleaning and etc. Always ready to work. Just saying these thing's because he really has potential and needs the opportunity to use it. Deshawn deserves another chance in life to become a productive citizen. Thank you.

Rodney King

Ex. A. 002

# My cousin Shawn



Mon 2/1/2021 11:17 AM
**From:** Rayshun Clay
**To:** "keri@ambrosiolegal.com"

My name is Laila Curtis and I am 12 years old. And I am writing this letter to tell you how much I miss my big cousin Shawn and what kind of person he is. I'm an only child I have no siblings its lonely being the only child. For as long as I can remember my cousin Shawn has been helping my mom looking after me while she worked. Until about five years ago since my cousin Shawn been gone I've had to change schools cause I was being bullied. Even though my mom handled the situation at the end of the day when you have someone waiting outside to pick you up you dont feel like such a baby. It's just different so if he can just come home I will keep him very busy so there isn't any way he will get into any trouble

Sincerely, Laila😘 😘

Sent from Yahoo Mail on Android

Ex. A. 003

# My Big Cousin Shawn

Mon 2/1/2021 11:37 AM
**From:** Rayshun Clay
**To:** "keri@ambrosiolegal.com"



Hi, I'm Jacques and I am writing this letter to tell you how much of an impact he has had on my life. I'm quite different from other children I know no matter how much my mom tries to tell me I'm the same as other kids. She supposed to say that shes my mom. Shawn spent time with me when the others didn't I don't care what if my mom asked him to look after me he's the only person my mom didn't have to pay to hang out with me. It's been sad cause I dont get out much cause my mom is afraid to let me go out alone and I'm afraid of the cousin she has to pay. Cause she says I need to know the difference between good people and bad people. Man I miss my big cousin was here to take me to the park. Play games and qoing to the movies. Please help him come home.
Jacques

Sent from Yahoo Mail on Android

Ex. A. 004

## Deshawn Danzlers

Wed 2/3/2021 11:28 AM
**From:** mykia allen
**To:** Keri@ambrosiolegal.com



To Whom it May Concern Deshawn Is A very good person I believe he should come home he nice very kindhearted he will give you the shirt off his back if you need it he has helped plenty of people out homeless weather they were lying or not he didn't care he helped me raise my son he is like a father figure to my child he ask about him all the time we just wish he can come home and be a better person I grew up with Deshawn he my cousin but we are more like brother an sister it hurt my heart knowing he in jail because Deshawn is a genuine person he quite don't have a lot of friends he mainly be to him self Deshawn deserve a second chance I believe he will do better an become the strong man he is suppose to be he want to get him a job an take care of his mother we really miss him an I hope all this is over

Sent from Yahoo Mail for iPhone

Ex. A. 005

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | No. 19 CR 518-1 |
| vs. | Hon. Ronald A. Guzman |
| | |
| DESHAWN DANZLER | |

CERTIFICATE OF FILING AND SERVICE

To: Mr. Albert Berry, III, Assistant U.S. Attorney, via electronic mail

The undersigned, Keri A. Ambrosio, hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, L.R. 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

- *DESHAWN DANZLER'S SENTENCING STATEMENT*

was filed and served pursuant to the district court's ECF system as to ECF filers, on February 3, 2021.

s/ *Keri Ann Ambrosio*
Keri A. Ambrosio, Esq.
53 W. Jackson Boulevard, Ste. 920
Chicago, IL 60604
(312) 961-3261
keri@ambrosiolegal.com
Counsel for Mr. Danzler