UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | 19 CR 518 |
| v. ) | |
| ) | Judge Ronald A. Guzman |
| DESHAWN DANZLER ) | |

## GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS

On June 18, 2015, Victim A was murdered. Victim A was standing outside DeShawn Danzler's door when a person jumped out from behind a staircase and shot Danzler. Soon after Danzler closed the door, there was a pause in the shooting and then more shots. When Danzler's door was opened, Victim A lay deceased on the ground. Though he knows the perpetrator of the horrific shooting mentioned above, DeShawn Danzler refuses to testify about the identity of the shooter or anything related to the shooting. He didn't do so out of fear. He told Chief Judge Castillo as much when he told the court he was not afraid to testify, but just did not want to testify. Danzler refused orders of the court to testify and continues to do so due to a code of the streets that has infested neighborhoods throughout the country and caused dangerous individuals to be left on the street to wreak havoc and cause additional destruction and mayhem.

The government believes the court should fashion a fair and just sentence for DeShawn Danzler featuring a mixture of incarceration and post-release supervision that takes into account, (1) the nature and circumstances of the offense; (2) the history

and characteristics of DeShawn Danzler; (3) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need for the sentence to afford adequate specific and general deterrence to the criminal conduct; (5) the need for the sentence to protect the public from further crimes of the defendant; and (6) the need for the sentence to provide the defendant with needed educational or vocational training or medical care. The government's recommendation for the sentence that should be imposed is dependent upon the guideline range the court finds applicable. The government will expound on this further at sentencing.

## I.  BACKGROUND

On June 20, 2019, DeShawn Danzler was indicted on one felony count charging him with contempt, in violation of Title 18, United States Code, Section 401(3). Dkt. No. 1. On June 27, 2019, defendant appeared before the Court and entered a plea of not guilty to the indictment. Dkt. No. 7. On November 12, 2020, the defendant changed his plea and entered a plea of guilty, by way of plea declaration, to the indictment. Dkt. No. 68.

## II.  SENTENCING GUIDELINES

The parties and the US Department of Probation agree that the defendant falls into a criminal history category of V. However the parties disagree about the offense level. The defendant believes the offense level is 4, and has a sentencing guideline range of 4 to 10 months' incarceration. The US Department of Probation found the offense level to be 7, which computes to a sentencing guideline range of 12 to 18

months' incarceration.

The government maintains its position in its government's version that the offense level should be 27. Coupled with a criminal history category of V, it is the government's position that the sentencing guideline range applicable to this case is 120 to 150 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

The decision as to what guideline sentence applies in this case turns on the application of *United States v. Ortiz*, 84 F.3d 977 (7th Cir. 1996). *Ortiz* sought to delineate whether obstruction of justice (U.S. Sentencing Guideline Section 2J1.2) or failure to appear as a witness (U.S. Sentencing Guideline Section 2J1.5) applies in a contempt prosecution. In that case, the defendant, Hurtado, had pleaded guilty to a drug charge and was called to testify at his co-defendant's, Ortiz's, trial. He was immunized, answered a few questions, and then generally refused to testify because he didn't want to be a "snitch." *Id.* at 978. The co-defendant was convicted but the government obtained a criminal contempt charge against the defendant who refused to testify. *Id.* at 978-79.

The Seventh Circuit held the district court should have applied Section 2J1.5 (failure to appear as a witness) in calculating the guidelines range because the defendant's conduct wasn't much like being an accessory after the fact as the defendant did not comfort or assist his co-defendant. *Ortiz*, 84 F. 3d. at 980. In fact, his post-arrest statements and some of his trial testimony implicated the co-defendant. Additionally, he did not obstruct justice in any way other than refuse to

testify. More importantly, the defendant's conduct did not actually obstruct justice; his co-defendant was charged and convicted. *See also United States v. Jackson*, 2003 WL 444459 (N.D. Ill. Feb. 24, 2003) (Kennelly, J.) (applying *Ortiz* in a similar context and using Section 2J1.5).

It is the government's position that in the case at hand, Danzler's refusal to testify has a more obstructive aspect to it. Unlike Hurtado in *Ortiz*, Danzler's refusal to testify has put a pause in the proceedings against the perpetrator for the murder of Victim A. Though the perpetrator is currently incarcerated for another murder, the murder of Victim A has not been charged. Additionally, though Danzler may say he does not want to assist the perpetrator, his refusal to testify has given the perpetrator comfort that he will not be reported to law enforcement. Adhering to a street code has caused the perpetrator to remain uncharged for the murder, even though Danzler clearly knows his identity. Therefore, the government requests that the court find the guideline range to be 120 to 150 months' incarceration (level 27, criminal history category V).

**Recommended Conditions of Supervised Release**

Given the circumstances of the offense and the history and characteristics of the defendant, the government recommends the maximum term of three years' supervised release.

The applicable mandatory conditions of supervised release under 18 U.S.C. § 3583(d) are set forth on pages 24 and 25 of the PSR. The government has no objection to the mandatory conditions of release set forth in conditions (1), (2), (5) and (6). The

government has no objection to the recommended discretionary and special conditions of Supervised Release set forth on pages 25 through 30 of the PSR, and concurs with the probation officer's rationale for these conditions. Specifically, the government agrees that discretionary conditions (4), (6), (8), and special conditions (1), (2), (3), (11), and (13) promote the statutory factors of affording adequate deterrence to criminal conduct, protecting the public from further crimes by the defendant, and assisting the defendant in reintegrating into society upon his release. Providing defendant with adequate educational and job training will help him achieve employment, which will be crucial in helping prevent recidivism.

The government further agrees that discretionary conditions (7), (9), (14), (15), (16), (17), and (18) and special condition (14) promote the statutory factor of allowing for effective monitoring of defendant during any supervised release term imposed.

### III. NATURE, CIRCUMSTANCES, AND SERIOUSNESS OF THE OFFENSE

In order to fully appreciate the contempt conviction, there are some underlying facts that need to be addressed. On June 18, 2015, Individual A, a member of a rival gang to defendant's older brother, traveled to the apartment building where Danzler lived, shot Danzler, and murdered Victim A.

Individual A buzzed several apartments until Victim A, who lived in the first-floor apartment, answered the door. Moments later, Victim A knocked on the door to Danzler's apartment, which was the basement unit. Danzler partially opened the door and saw Victim A. Individual A then jumped out of the stairwell and began shooting Danzler, who slammed the door shut. Individual A continued to shoot

through the door. There was then a pause in the shooting, after which Individual A shot Victim A several times. Individual A then fled the scene. Danzler survived with a deep graze wound to his scalp, a shot to the leg, and a broken wrist, but Victim A died from his wounds.

Danzler was transported to the hospital. While there, Danzler was interviewed by detectives from the Chicago Police Department. He gave an account of what happened that was consistent with the facts described above, except that he claimed he did not see the shooter. The next day, July 19, Danzler received a telephone call from Individual A, which Danzler placed on speakerphone. During the call, Individual A taunted Danzler. He told Danzler he was "fast" unlike the "other guys" (presumably a reference to other rival gang members that Individual A had successfully shot or murdered).

The evening of June 19, 2015, after he was discharged from the hospital, Danzler received several calls from his brother, who was in jail. During those calls, Danzler described in detail the events of June 18, and identified the shooter, by name, as Individual A. Danzler's brother confirmed that he knew who Individual A was. As there were no other individuals that witnessed the shooting inside the apartment building, Danzler's testimony was crucial and necessary to charge Individual A for the murder of Victim A.

In March of 2019, Danzler was writ over to federal custody to have him testify before a federal grand jury about the shooting that took place on June 18, 2015. On or about March 20, 2019, the Honorable Rubén Castillo, Chief Judge of the United

States District Court for the Northern District of Illinois, issued an oral order pursuant to Title 18, United States Code, Section 6002, compelling Danzler to testify before a convened grand jury regarding a specific incident that occurred on or about June 18, 2015 in Chicago, Illinois. During that appearance, Danzler informed the Chief Judge that he was refusing to testify. Chief Judge Castillo told Danzler that he could be held in contempt if he refused to testify and Danzler stated, "I understand." When Chief Judge Castillo asked Danzler, "Is there some concern for your safety [ ]?" Danzler replied, "No, Your Honor." When Chief Judge Castillo told Danzler, "So you just don't want to cooperate no matter what, and you understand that's going to put you squarely in contempt," Danzler responded, "That's okay." The court held Danzler in civil contempt and gave Danzler the opportunity to comply with the court's oral order.

On March 26, 2019, Danzler was brought back before the court. Danzler told the court that he was "sure" he did not want to testify before the grand jury about the shooting incident. The court extended the civil contempt order to April 3, 2019 and kept Danzler in federal custody.

On April 3, 2019, Danzler was brought back before the court. In reference to testifying before the grand jury, the court asked Danzler, "Have you thought about it some more?" Danzler replied, "Not at all, sir." Danzler proceeded to reaffirm his unwillingness to testify before the grand jury about the shooting. Danzler told the court, "I wish they would charge me with whatever they will charge me with and get it out of the way." Chief Judge Castillo told Danzler, "You have a very, I would say,

7

Mr. Danzler, cavalier attitude about this, where you're conveying to me -- I'm a guy who grew up on the West Side -- you could care less about this, and that's pretty sad." Danzler was told that he would stay in federal custody and would at some point be charged with criminal contempt.

On May 1, 2019, Judge Castillo issued a written order pursuant to Title 18, United States Code, Section 6002, granting Danzler immunity and compelling Danzler to testify before a grand jury about the shooting incident. The order stated, in part, "Deshawn Danzler shall not be excused from testifying and giving evidence in the proceedings before the [ ] Grand Jury on the ground that the testimony and evidence required of him may tend to incriminate him, and that Deshawn Danzler shall appear before the said Grand Jury and testify and provide evidence without further asserting there his privilege against self-incrimination."

On May 22, 2019, Danzler appeared before the grand jury and refused to testify when asked questions about the June 18, 2015 incident. Danzler was later indicted before a separate grand jury for contempt based on his refusal to testify. To date, Individual A has not been charged with the murder of Victim A.

Danzler's refusal to testify in this case even though he has been given immunity is an affront to the criminal justice system. In his own words, Danzler is not afraid to testify. Instead he has shown a loyalty to an abhorrent code of the street. The seriousness of the crime cannot be understated.

**IV.   HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

Currently DeShawn Danzler is 26 years old. PSR p. 3. Danzler was raised on

the southeast side of Chicago in a violent neighborhood. PSR ¶102. The defendant has two maternal half-brothers. One is deceased and the other is currently incarcerated in the custody of the Illinois Department of Corrections. PSR ¶ 103.

While Danzler was in federal custody, he accumulated approximately *forty* violations across three separate institutions. PSR ¶¶ 3 – 44. Additionally, there is an incident that was not mentioned in the PSR. On May 19, 2019, while he was housed in the Jerome Combs Detention Center in Kankakee, Illinois, Danzler attacked an then injured inmate, a rival gang member, from behind.

There is no dispute that the defendant had a tough upbringing in a rough neighborhood, joining a gang between the age of 12 and 14. PSR ¶110. However, the defendant's behavior has not changed as he has grown older. He continues to disobey rules and attack people he does not agree with. Additionally, he has amassed a record that has made him a Category V offender.

The history and characteristics of the defendant, including his lengthy arrest and criminal history, weigh as an aggravating factor against the defendant and call for a sufficient sentence of incarceration followed by three years of post release supervision.

V. **ADEQUATE DETERRENCE**

The defendant should be given a significant sentence for specific and general deterrence. Blindly adhering to an abhorrent code of the street against lawful orders no matter the consequences should be adequately punished and not tolerted. The defendant and the public need to know that federal courts wil not stand for

individuals disobeying the law because they don't agree and have a different "code."

### III. Conclusion

For the reasons set forth above, and in consideration of the factors enumerated under 18 U.S.C. § 3553(a), the government respectfully requests that this Court impose an adequate sentence of incarceration to be followed by three years of post-release supervision. After the determination of the sentencing guideline range, the government will put forth a more specific recommendation.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney


By: /s/ *Albert Berry III*
ALBERT BERRY III
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 886-7855

Dated: February 4, 2021